IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| RICHARD WEBB, DOTHAN ROGERS and SEBRON FLOYD, | )<br>)<br>) |
| Plaintiffs, | ) Case No. 00 C 1230<br>) |
| v. | ) Judge Virginia M. Kendall<br>) |
| TIMOTHY BUDZ, et al., | )<br>) |
| Defendants. | ) |

MEMORANDUM OPINION AND ORDER

Plaintiffs Richard Webb, Dothan Rogers and Sebron Floyd ("Plaintiffs") have brought suit against Timothy Budz, Robert Glotz, Raymond Wood, Travis Hinze, Richard Travis, Tom Eisfelder, and Shan Jumper ("Defendants") for discrimination on the basis of race in violation of the Equal Protection Clause.[1]  Defendants move for summary judgment as to all three Plaintiffs.  Because Plaintiffs have not presented a genuine issue of material fact as to whether similarly situated non-protected individuals were treated differently than Plaintiffs, or presented admissible evidence that Defendants intended to discriminate on the basis of race, Defendants' Motion for Summary Judgment is granted.

---

[1] Defendants Carla Guest, Margaret Farley, Jeff Golde, and David Suire were dismissed on August 30, 2005 for failure to serve pursuant to Federal Rule of Civil Procedure 4(m). Defendants argue that individual defendants Pedersen and Snider were inadvertently left out of the August 30, 2005 order as Plaintiffs also failed to serve these two individuals. The docket does not reflect that these two persons received service at any point in this case, and Plaintiffs did not object to Defendants' 56.1 statement regarding individuals Pedersen and Snider. Therefore, individuals Pedersen and Snider are dismissed with prejudice for failure to serve within the time permitted by Federal Rule of Civil Procedure 4(m).

Statement of Facts

At the time of the events forming the basis for this action, Plaintiffs, all African-American, were civil detainees at the Illinois Department of Human Services Treatment and Detention Facility for Sexually Violent Persons (the "TDF") in Sheridan, Illinois. Defendants' Statement of Undisputed Facts ("Def. 56.1 Facts") at ¶ 1, 2.[2] Each of Plaintiffs had been civilly detained pursuant to the Sexually Violent Persons Commitment Act, 725 ILCS 207/1 *et seq.* (the "Act"). Def. 56.1 Facts at ¶ 2. Under the Act, persons who have finished their period of incarceration with the Illinois Department of Corrections ("DOC") may be transferred to the TDF for civil detainment if they are determined to be a continuing threat to themselves or to the community into which they would be released. *See* 725 ILCS 207/15, 207/40. At the time of the events, Defendant Budz was the TDF facility director, Defendant Glotz was the TDF security director, Defendant Wood was the TDF clinical director, Defendant Hinze was the TDF associate clinical director, and Defendants Speaker, Travis, Eisfelder, and Jumper were TDF clinical therapists. Def. 56.1 Facts at ¶¶ 3-10.

Within the treatment program at the TDF, individuals are placed as general residents of the facility Def. 56.1 Facts at ¶ 11. If a resident poses an imminent threat to himself or to another, TDF staff place the individual on temporary special/secure management status ("SMS"). Def. 56.1 Facts at ¶ 12. At the Sheridan TDF, SMS is a separate area from the rest of the general unit. Def. 56.1

---

[2] Defendants filed a separate Motion to Strike regarding Plaintiffs' Responses to Defendants' 56.1 Statements of Undisputed Material Facts. Plaintiffs responses to each numbered paragraph of Defendants' 56.1 Facts do not always comply with Local Rule 56.1(b)(3)(B). Plaintiffs have often responded with an admission as to a portion of Defendant's statement, making no reference to remainder of the statement. In these instances, the Court has deemed Plaintiffs' failure to respond "with specific references to the affidavits, parts of the record, and other supporting materials" to be an admission, as required by the Local Rule 56.1(a).

Facts at ¶ 13. The SMS policy has eight levels of confinement within SMS, each of which corresponded to different amounts of privileges. *Id.* at ¶ 14.

After a behavioral incident leads to initial placement on SMS, the Behavior Management Committee ("BMC") assesses the dangerousness of the individual on SMS to determine whether that person should remain on SMS and at what level. *Id.* at ¶ 12. The BMC also periodically reviews residents on SMS to determine when an individual should move levels. *Id.* at ¶ 12, 15. In deciding whether an individual should move levels, the BMC considers several factors, including: (I) level of dangerousness; (ii) the individual's willingness to meet and discuss the incident that led to the placement on SMS; (iii) the individual's acceptance of responsibility; (iv) the individual's agreement to development of plan to prevent further such incidents; (v) the mental status of the individual; (vi) the resident's behavior history in the TDF program and in the Department of Corrections ("DOC"); (vii) the individual's behavior while in SMS; and (viii) whether there are criminal charges pending against the individual. *Id.* at ¶ 17. The BMC places considerable weight on its review and assessment of the resident's behavior while in SMS in deciding whether to adjust the SMS level. *Id.* at ¶ 19.

While on SMS, the BMC could determine that an individual might pose a danger to himself or others with certain personal items, such as a toothbrush. If the BMC makes such a determination, made on an individual basis, the personal items posing a danger would be removed from the resident's room. *Id.* at ¶ 19. The TDF staff keep some personal hygiene items out of the rooms of all persons on SMS because those items could be used as weapons. *Id.* at ¶ 20.

As part of policy at the TDF, the facility director and security director make decisions whether to refer to the Illinois State Police (the "State Police") any credible evidence of a potential

felony committed within the TDF facility. Once referred, the State Police bear sole responsibility for the decision whether to press criminal charges. *Id.* at ¶¶ 21. Whenever possible criminal charges are pending against an individual, the individual remains on SMS as a safety precaution. *Id.* at ¶ 22.

*Facts Specific to Plaintiffs Rogers and Floyd*

On December 25, 1999, security staff at the TDF noticed that as Plaintiff Rogers left breakfast he took cereal from the dietary and placed it in his sock. Def. 56.1 Facts at ¶ 23. When the security staff attempted to confiscate the cereal, Rogers resisted and struck a staff member in the head. *Id.* at ¶¶ 23-24. Rogers denies that he struck the security staff member more than once, but admits that the security staff member had abrasions to his face and head, fell to the ground as a result of the strike, and admits that he hit the officer hard enough that the officer could not focus his eyes and was unsteady on his feet. *Id.* at ¶¶ 24-25.

When Rogers struck the security staff member, the employees in the area called a "fight in progress" and summoned other security officers. *Id.* at ¶ 25. Plaintiff Floyd attempted to hold the gate to the room shut in order to prevent security officers from entering and responding to the fight between Rogers and the security officer. *Id.* Once the additional security officers broke through the gate, Floyd pushed and shoved another officer. *Id.* at ¶ 26; Floyd Dep. at Pg. 9-12. After the fight had been brought under control, the entire facility was placed on lockdown status, Floyd and Rogers were placed on SMS, and the State Police were notified of the batteries committed by Rogers and Floyd. *Id.* at ¶ 28. Plaintiffs Rogers and Floyd do not dispute any of these events.

On December 27, 1999, the BMC reviewed the incident and placed Rogers and Floyd on SMS level 0, the most restrictive level. *Id.* at ¶ 29. In January 2000, security found a shank in

4

Rogers' room, and Rogers made threats to hurt staff members. *Id.* at ¶ 46. In March 2000, staff found contraband in Rogers' room. *Id.* Rogers remained on SMS until March 31, 2000, when he was returned to the DOC. *Id.* at ¶ 47. Floyd threatened to have a female security officer killed and threatened to throw feces and urine in March 2000, and used a shampoo bottle to squirt what was purported to be urine at a security officer in April 2000. *Id.* at ¶ 44. Floyd remained on SMS until May 19, 2000 when he was returned to the DOC. Both Rogers and Floyd plead guilty to charges of aggravated battery as a result of the incident on December 25, 1999. *Id.* at ¶¶ 30-32.

*Facts Specific to Plaintiff Webb*

On December 25, 1999, after the facility had been placed on lockdown as a result of the assault involving Rogers and Floyd, security went to Plaintiff Webb's room in order to collect trash. *Id.* at ¶ 33. When the security staff entered the room, an altercation occurred. *Id.* at ¶ 34, Webb Dep. at 35-38. Records of the incident state that Plaintiff Webb threatened to kill staff, although Plaintiff Webb does not recall whether he threatened violence. Def. Ex. E-1; Webb Dep. at 38. After completing the standoff, in which officers claim Webb brandished pens as weapons and refused to re-enter his room, Webb gave the officers hugs and returned to his room. Def. 56.1 Facts at ¶ 36, Webb Dep. at 35-38.

On December 27, 1999, BMC placed Webb on SMS level 0 as a result of his threats to kill staff and his threatening behavior toward staff. *Id.* at ¶ 35. The TDF also reported Webb's behavior to the State Police. On January 3, 2000, BMC reviewed Webb's behavior, found no problems since entering SMS, and moved him up from level 0 to level 1A. Def. Ex. E-2, p. W/WRF-822. On January 12, 2000, Webb threatened to hurt staff by pushing them out a window; he remained on level 1A despite the verbal threats. Def. 56.1 Facts at ¶ 38, 39. Webb made several verbal threats during

5

January and February but remained on level 1 status; he was moved back to Level 0 on February 21, 2000 after he stated that he would kill security staff if it were not for security. *Id.* at ¶ 41.

Starting in March 2000, Plaintiff Webb no longer exhibited problematic behavior and moved up levels in SMS after each week's review. *Id.* at ¶ 43. The records from the TDF state that Plaintiff Webb was released into the TDF general populace on April 25, 2000; Webb claims he remained on SMS until August 2000. *Id.*; Webb Dep. at 88.

*Facts Related to Caucasian Residents of the TDF*

The parties present evidence of seven Caucasian individuals who spent time on SMS during the same time as Plaintiffs.

"D.K." is a Caucasian resident who was charged with inappropriate contact with a female member of the security staff. Def. Ex. K, p. KOR010. As a result of the incident, D.K. was placed on SMS from January 17, 2000 until March 8, 2000. D.K. admitted that he may have accidentally touched the officer and apologized to her. Def. 56.1 Facts at ¶ 50. D.K. demonstrated good behavior while on SMS and received no incident reports for improper behavior. He progressed from SMS level 0 through higher levels, receiving increasing privileges, until he was released with "unit restriction" on March 8, 2000. Def. 56.1 Facts at ¶ 52-54. Charges were not pressed against D.K. after the security officer stated she did not consider the inappropriate touching to be aggressive or indicative of an intent to harm. Def. Ex. K, p. KOR010. Plaintiffs dispute this account only to the extent that Rogers testified that D.K. hurt the officer, but he also testified that he did not personally see the incident and based his knowledge on an account he received from another security officer. Rogers Dep. at 67.

"G.W.," another Caucasian resident, jumped on the back of a security officer during a fight, resulting in the officer's hospitalization for a back injury. Def. 56.1 at ¶ 55. As a result of the incident G.W. was placed on SMS and Defendants requested that his parole be revoked. His parole was revoked and he was returned to DOC a few days later. *Id.* at ¶ 56. Defendants reported the incident to the State Police, and criminal charges were brought against G.W. *Id.* at ¶ 67.

"J.C." became involved in an altercation with another resident, during which time J.C. kicked a security officer who was attempting to break up the fight. *Id.* at ¶ 57. He was placed on SMS and the incident was referred to the State Police. *Id.* Approximately six months later, while still on SMS, J.C. committed aggravated battery by grabbing the breast and crotch of a female security officer. TDF also referred the second offense to the State Police, resulting in a criminal charge. J.C. remained on SMS for approximately 8 months until he was removed from the TDF. *Id.* at ¶ 58.

"J.A." hit a security officer on the head with a book, for which he was placed on SMS level 0. *Id.* at ¶ 59-60. After he behaved appropriately on SMS, he was removed from SMS after approximately 28 days. *Id.*

"E.W." tossed what was purported to be urine on a security officer while E.W. was already on SMS.[3] When the security officer entered the room, the two began fighting and were separated by other staff. *Id.* at ¶ 61. E.W. remained on SMS as a result of the fight for approximately one week; E.W. moved out of SMS rapidly as a result of good behavior. Defendant Budz testified that the security officer involved in the fight broke protocol by entering the room and resigned from his position as a result of the altercation. *Id.* at ¶ 62.

---

[3] Although not clarified by the parties, the Court concludes that "Mr. Winterhalter" and "E.W." are the same individual as both parties cite to portions of the record that use these names interchangeably to describe the same events.

"J.O." threatened to kill staff after staff conducted a search of his room for contraband. As a result, J.O. was placed initially on SMS level 0. *Id.* at ¶ 63. The BMC reviewed the situation and released J.O. from SMS after eight days because he accepted responsibility, agreed to talk with staff, and was willing to work toward treatment. *Id.* at ¶ 64.

"W.W." punched an officer in the jaw after security staff separated him from a homosexual encounter with another inmate. Pltf. Ex. B at 126. W.W. was placed on SMS status, approximately 3 cells away from Plaintiff Webb. Plaintiff Webb testified that W.W. had access to commissary and to a television while on SMS, and testified that he left SMS approximately three weeks to one month later. *Id.* at 128-29. The record does not reflect the level of SMS at which W.W. had been placed, the reviews by the BMC of W.W.'s behavior while on SMS, or any information about criminal charges.

## Standard of Review

Motions brought pursuant to Federal Rule of Civil Procedure 56(c) shall be granted if "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is appropriate when there is no genuine issue as to any material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). In reviewing a motion for summary judgment, all reasonable inferences are drawn in favor of the non-moving party. *Michas v. Health Cost Controls of Ill. Inc.*, 209 F.3d 687, 692 (7th Cir. 2000). The Court, however, will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. Of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000). Where a proposed

statement of fact is supported by the record and not adequately rebutted, the court will accept that statement as true for purposes of summary judgment. An adequate rebuttal requires a citation to specific support in the record; an unsubstantiated denial is not adequate. *See Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.").

## Discussion

To prove a claim under 42 U.S.C. § 1983, a plaintiff must show that he was deprived of a federal right, privilege, or immunity by a person acting under color of state law. *See Brown v. Budz*, 398 F.3d 904, 908 (7th Cir. 2005). There is no dispute that Plaintiffs' case has been brought against persons acting under color of state law. Defendants dispute that Plaintiffs can produce any evidence to show that they have been deprived of the federal right to equal protection.

A "prison administrative decision may give rise to an equal protection claim only if the plaintiff can establish that the prison officials intentionally and purposefully discriminated against him." *Merriwether v. Faulkner*, 821 F.3d 408, 415 n.7 (7th Cir. 1987). To prove that Defendants violated Plaintiffs' right to equal protection, Plaintiffs must show that Defendants' actions both had a discriminatory effect and were motivated by a discriminatory intent. *Chavez v. Illinois State Police*, 251 F.3d 612, 635-36 (7th Cir. 2001). A person bringing an action under the Equal Protection Clause may not merely show that he was treated unfairly as an individual; "the gravamen of equal protection lies not in the fact of deprivation of a right but in the invidious classification of person aggrieved by the state's action." *Shango v. Jurich*, 671 F.2d 1091, 1104 (7th Cir. 1982). "The

9

decisionmaker must have selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of' its adverse effects *upon an identifiable group.*" *Huebschen v. Dept. of Health and Human Svcs.*, 716 F.2d 1167, 1171 (1983) *quoting Personnel Administrator v. Feeney*, 442 U.S. 256, 279 (1979).

Plaintiffs claim that Defendants treated them unfairly because of their status as African-Americans. To demonstrate a prima facie case of discriminatory effect, in addition to being members of a protected class Plaintiffs must present evidence that: (I) they are similarly situated to members of the unprotected class and (ii) that Plaintiffs were treated differently from members of the unprotected class. *See McNabola v. Chicago Transit Authority*, 10 F.3d 501, 513 (7th Cir. 19930; *accord Brown*, 398 F.3d at 916; *Chavez*, 251 F.3d at 636; *Greer v. Amesqua*, 212 F.3d 358 370 (7th Cir. 2000) (applying same analysis in equal protection employment claim). Plaintiffs present evidence of two effects of discrimination: unequally poor treatment of African-Americans on SMS, and unequally frequent reporting of incidents involving African-American residents to the State Police.

A. Treatment While on SMS

*Similarly Situated Individuals*

In order to prove a *prima facie* case of discriminatory treatment while on SMS, Plaintiffs must show that similarly situated individuals were treated differently. A person is similarly situated to the plaintiff if the person is "comparable to the plaintiff in all *material* respects." *Crawford v. Indiana Harbor Belt R.R. Co.*, 461 F.3d 844 (7th Cir. 2006) (balancing the need for lenience in a broadly representative sample and frowning upon plaintiff's tendency to "cherry-pick" the best persons for comparison) (emphasis in original). It is not necessary that individuals be similar in *all*

respect so as to define the requirement of similarly too narrowly. *See Chavez*, 251 F.3d at 636. "[T]he purpose of the similarly situated requirement is to eliminate confounding variables, such as differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable . . ." *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007).

The parties agree that in all cases discussed in this action, specific acts of violence toward staff members lead to initial placement on SMS. The parties also agree that the BMC's periodic evaluation of a resident's SMS status and treatment on while on SMS is influenced in large part by the resident's own behavior choices while on SMS. If a resident behaves well during SMS, he is more likely to receive greater privileges after each weekly review of his behavior. If the resident takes responsibility for the action that resulted in SMS, he is more likely to be rewarded with a quick release. If, on the other hand, a resident continues to exhibit behavioral problems, the resident is less likely to be offered additional privileges or released.

In spite of Plaintiffs' admission that the BMC used facially race-neutral criteria to evaluate each SMS resident periodically and to adjust both privileges and confinement status, Plaintiffs urge this court to adopt a definition of "similarly situated individual" that takes into account solely the initial incident that led to placement on SMS. *See* Pltf. Resp. at 10. Under Plaintiffs' definition of "similarly situated," each of the Caucasian individuals identified is similarly situated to Plaintiffs because each committed an initial act similar to those committed by Plaintiffs. Rogers and Floyd committed assaults, and Webb threatened officers; the Caucasian residents placed on SMS committed acts ranging from throwing urine to assault on an officer causing serious injury.

In light of the various criteria used to evaluate residents on SMS for changes in status and for release, one of the most important of which is the resident's behavior *after* being placed on SMS,

it is not appropriate to define similarly situated individuals solely on the basis of their behavior *before* being placed on SMS. Plaintiffs do not make any claims about unequal initial placement on SMS; they limit their claims solely to their unequal treatment after placement on SMS. *See Ezell v. Potter*, 400 F.3d 1041, 1049 (7th Cir. 2005) (in disparate discipline cases in the employment context, the plaintiff must show similar situation not only in rank but "with respect to performance, qualification, and conduct."). As the behavior of the individuals while on SMS is a significant factor in determining the duration of custody and the privileges granted during that custody, the behavior of the Caucasian residents after being placed on SMS is a material factor determining similarity.

When reviewing the comparable Caucasian residents in light of their behavior after they were placed on SMS, the undisputed evidence shows that five of the seven Caucasian residents cited by Plaintiffs were not "similarly situated" to Plaintiffs Rogers and Floyd. Defendants have presented unrefuted records of the weekly evaluations of each of the Caucasian residents who progressed out of SMS, each of which shows progress up the levels of SMS as a result of good behavior and acceptance of responsibility. Plaintiffs admit that each of these same records in Rogers' and Floyd's files show that each Plaintiff engaged in numerous acts of insubordination while on SMS, including threats on security staff, concealing weapons and contraband, and throwing urine at staff members. Because each of the Caucasian residents took affirmative steps to fulfill each of the factors used by the BMC to determine who deserved promotion out of SMS - including good behavior, acceptance of responsibility, and willingness to engage in counseling - while Plaintiffs Rogers and Floyd admit that they continued to make threats and commit acts of violence against the security staff, these Caucasian residents are not similarly situated.

Plaintiffs rely heavily on the treatment of E.W. to support their position. The parties agree that the TDF released E.W. from SMS only one week after fighting with a security officer. Plaintiffs fail to mention, but admit in their response to Defendant's Statement of Facts, that the officer assaulted by E.W. violated protocol by entering E.W.'s room without permission to commence the fight, and resigned over the incident. An individual whose behavior while on SMS was provoked by a member of the security staff is not similarly situated to Plaintiffs, who make no suggestion that their negative acts while on SMS were provoked.

Plaintiffs have not presented evidence by which a reasonable jury could find that Plaintiffs Rogers and Floyd were similarly situated to most of the Caucasian residents described. But there exists a genuine issue of fact as to whether the Caucasian residents discussed above were similarly situated to Plaintiff Webb, who did commit some acts of insubordination but was ultimately released from SMS. There also exists a genuine issue of fact as to whether the final two Caucasian residents discussed in the record, G.W. and J.C., were similarly situated to Plaintiffs Rogers and Floyd, because both J.C. and G.W. committed violent acts to warrant placement on SMS and may have committed violent acts after placement on SMS.

*Disparate Treatment of Similarly Situated Individuals*

Even if there exists a genuine issue of material fact as to the existence of similarly situated residents who were outside the protected class, Plaintiffs have failed to meet their burden that these individuals were treated differently. Of the two Caucasian residents who might be similarly situated to Plaintiffs Rogers and Floyd, both suffered the same fate as Plaintiffs: they were returned to DOC for criminal prosecution in connection with the assaults that led to their placements on SMS level 0. In the case of G.W., criminal charges were pressed quickly enough that he returned to DOC

13

within a matter of days. In the case of J.C., criminal charges took several months to complete (as occurred with Plaintiffs Floyd and Rogers), he committed additional acts of violence after placement on SMS (as did Plaintiffs Floyd and Rogers). Just like Rogers and Floyd, J.C. remained on SMS; indeed, he remained on SMS longer than either Rogers or Floyd. At the end of eight months, J.C. was also transferred to the DOC. Contrary to Plaintiffs' assertions, the record reflects that these two Caucasian residents received treatment similarly if not more harsh than that received by Plaintiffs Rogers and Floyd.

Plaintiff's Webb's treatment likewise parallels that of the Caucasian residents similarly situated to him. Each of the Caucasian residents, like Webb, showed good behavior on SMS. As behavior improved, the BMC periodic evaluations rewarded that behavior by increasing the resident to a higher level of SMS, eventually leading to release. When Webb initially entered SMS he remained on level 0, and gradually worked his way to level 1A. When he misbehaved, BMC evaluated him and allowed him to remain at level 1A; when he misbehaved more severely, BMC moved him back to level 0. After a consistent period of good behavior, Plaintiff Webb moved up to level 2, and was eventually released to the general population.

While Plaintiffs assert that they received less privileges than their Caucasian residents, these assertions are either lacking personal knowledge (e.g., Plaintiffs heard about privileges for Caucasian residents via third parties, or Plaintiffs received no outside exercise privileges and heard that other Caucasian residents did) or lack evidence that the person with the additional privileges was at the same SMS level as Plaintiffs at the time the additional privileges were given. For example, Plaintiff Webb testified that he saw W.W. had additional commissary when Webb walked past W.W.'s cell, but the record is silent as to the SMS level of W.W. at the time Webb saw the additional privileged

14

material. Without any evidence in the record as to W.W.'s SMS level at the time Webb observed him, Plaintiff Webb cannot support his argument were the conclusory argument that W.W.'s treatment was more favorable without presenting evidence that W.W.'s treatment was inconsistent with the neutral review system in place for determining privileges while on SMS.

B. Unequally Frequent Prosecutions

Plaintiffs also claim that Defendants unequally reported incidents involving African-American residents to the State Police while other similarly situated Caucasian residents were not referred for prosecution.[4] Defendants have presented unrefuted evidence that ten Caucasians were referred to the State Police, four of whom were ultimately prosecuted at the discretion of the police. Def. 56.1 Facts at ¶¶ 55-58. Plaintiffs argue that four of the seven Caucasian individuals who might be similarly situated were not referred to State Police despite committing batteries against staff members.

Plaintiffs have presented no evidence to substantiate this statement. The record reflects that the four individuals - D.K., G.W., J.A. and E.W. - either had substantial differences from Plaintiffs, or were referred to the State Policy. The record of the incident report for D.K., who inappropriately touched a female officer, indicates that the TDF called the State Police regarding the incident and the State Police determined that the incident as described did not warrant criminal charges. G.W. and J.A., both of whom committed assaults, were both referred to the State Police. *See* Budz Decl., Def. Ex. C. at ¶ 26. E.W. was not referred to ISP as a result of his altercation with a security staff member, but as occurred in the context of the disparate treatment claim, Plaintiffs fail to refute

---

[4] Plaintiffs make clear in their Response that they have not claimed that African-Americans were selectively prosecuted. It is undisputed that the Illinois State Police, and not the TDF or TDF staff members, decide whether to bring criminal prosecutions for alleged acts that occurred in the TDF. Plaintiffs limit their claims to selective referrals by TDF to the State Police.

Defendant's evidence that the security officer broke protocol by entering E.W.'s room and fighting with him after E.W. insulted him. Plaintiffs have not presented evidence to meet their *prima facie* burden to show that similarly situated Caucasian residents were treated differently with respect to referrals to the State Police.

Discriminatory Intent

Even if Plaintiffs could show that the Caucasian residents discussed were similarly situated to Plaintiffs and were treated differently while on SMS or in the context of ISP referrals, Plaintiffs cannot meet their burden to show that the differences in effect were motivated by an intent to discriminate against them on the basis of their race. A plaintiff must be able to show that the decisionmaker acted with a discriminatory purpose in order to establish a violation of equal protection. *See McClesky v. Kemp*, 481 U.S. 279, 292 (1979). "Discriminatory purpose implies more than an intent as awareness of consequences. It implied that the decisionmaker selected or reaffirmed a particular course of action at least in part 'because of' its adverse effects upon an identifiable group." *Chavez*, 251 F.3d at 645 (internal quotations omitted).

To support their claims of discriminatory purpose, Plaintiffs rely upon statements that Plaintiffs attribute to "Defendants." This evidence includes: a statement by a non-party staff member that "you can never trust a 'nigger,' not unless you see him crying;" a conversation between Rogers and Budz, the substance of which Rogers could not recall but which Rogers interpreted as implying racism; a discussion overheard by Plaintiff Webb concerning wearing a white robe as part of a Halloween costume that he interprets to be a Ku Klux Klan reference; and statements by some staff members that they either felt discriminated against personally, or they overheard unnamed others making discriminatory comments. A review of the record shows the statements relied up on by

Plaintiffs are inadmissable hearsay, not based in personal knowledge, or are statements made by TDF staff members who are not named as Defendants. *See* Fed. R. Civ. P. 56(e) (evidence opposing summary judgment must be admissible). Plaintiffs have not brought suit alleging that the TDF or the DOC implemented a policy or practice of discrimination; instead they have charged that the named Defendants violated their right to equal protection via their individual actions, both inside and outside their official capacities. But the statements provided by Plaintiffs as evidence of racism are attributable only to TDF staff who are not named; that evidence is not attributable to the named Defendants as required in order to survive a motion for summary judgment. *See Chavez*, 251 F.3d at 646 (racially offensive statement made by an officer unrelated to action taken against plaintiff not evidence of discriminatory intent on the part of the officer who took the action against plaintiff). Therefore, Plaintiffs have not produced evidence suggestive of discriminatory motive on the part of Defendants to support a *prima facie* case of equal protection violation.

## Conclusion

Because Plaintiffs cannot establish a *prima facie* case of discriminatory effect or discriminatory intent as required to demonstrate a violation of their federal right to equal protection, Defendants' Motion for Summary Judgment is granted. Defendants' corresponding Motion to Strike is granted in part and denied in part in accordance with this Opinion.

_____
Virginia M. Kendall, United States District Judge
Northern District of Illinois

Date: March 27, 2007